WOLF, The DAVID E. See Case No. 3,594.

WOLFE (BAIRD v.). See Case No. 760.

## Case No. 17,929.

### WOLFF v. CONNECTICUT MUT. LIFE INS. CO.

[2 Flip. 355; 8 Ins. Law J. 97; 7 Reporter, 357.] [1]

Circuit Court, E. D. Michigan. March, 1879.

LIFE INSURANCE—SUICIDE OF ASSURED—INSANITY.

Although neither an act of suicide, nor an attempt, nor a threat to commit suicide alone creates such a presumption of insanity as would justify a jury in finding a party insane, such an act may properly be considered in connection with the previous demeanor and conduct of the party as an item of testimony tending to prove insanity.

Motion for a new trial. The action was upon a policy of insurance, which insured the life of Henry Wolff, in the amount of $2,000. Defense was made that the assured committed suicide; which was a risk not covered by the policy; to which the assured replied that he was insane at the time he took his life. The case was brought before a jury and a verdict rendered for the full amount of the policy and interest. The motion was made for a new trial upon the ground that the evidence admitted to go to the jury to the effect that the assured was insane at the time he took his life, was improper.

The evidence of insanity consisted of certain eccentric and temporary hallucinations, occurring from about a year and a half up to about three months before the suicide; the first of which occurred about a year and a half before his death when he was walking home, at noon, with his brother. The latter relates the incident as follows: "It had rained before, and there was a puddle of water standing on the sidewalk, and when he came there he slapped me on the arm and says, 'See! there is money, can't you see? I will make money out of that. That is the biggest thing in the world to make money out of.' I laughed at him, and I says, 'What is the matter with you, are you out of your mind, or what ails you?' 'Don't you see that dog,' he says, 'he is chasing me. Why he follows

me all the time.' There was no dog there. He went to dinner as usual and returned to his work in the afternoon." At another time he awoke his wife in the night and wanted to know if she didn't hear singing outside. He said he thought he heard them singing just as in church. It appears that no person was there. Shortly after this incident he retired and went to sleep, and in the morning was up about his business as usual. His wife relates another occurrence as follows: "Then again he got up in the middle of the night when it was raining and thundering. When I woke up he was off. I didn't know where he was. I got up and made the light and waited about an hour and then he came, and he had been up on top of the house and was all wet. I didn't know where he was, and I asked him and he said he had been on top of the house. He did that two or three times in one summer, the last summer of his life. He said it was very nice on top of the house when it rained; he liked it. * * * Again: he woke up one night and wanted to go off; I had just been sick and I could not follow him. He got up in the middle of the night, in his night clothes—as I was I could not go —and took the key out of the door, and he got up and went off. He just put on slippers and went off with nothing on. About five o'clock in the morning a policeman came and wanted some clothes for my husband. He said they had him in the police station and they wanted some clothes for him to put on; he often did that nights. This was in the summer before his death." At another time his brother relates that "he came to my house very early in the morning, about five o'clock, knocked on the door and I got up out of bed and asked him what was the matter. He says, 'Can you see all those men out there? All these men want to kill me, every one of them. Don't you see them? Every one, straight up there on the whole street want to knock me down.' I says, 'What is the matter with you. Come here and sit down.' My wife gave him a cup of coffee and he sat down, but he talked of different things, took his coffee and went off. He went to work after breakfast as usual." On another occasion he came into the store in the middle of the afternoon, locked the door, and taking the key, went up stairs where his brother was and made some remarks betraying hallucination and temporary derangement. At another time he came up stairs where his men were at work and compelled one of the men to walk up and down the room briskly forty or fifty times. This was because he thought he had been slow about some errand. He bought a horse, after that, for $120, but not being satisfied tried to sell him to his clerk for twenty-five cents. The clerk paid the money. At night when he went home he found the horse at his stable, Wolff having ordered his teamster to take him there. The next day the clerk says, "I told him I was only joking when I gave

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 7 Reporter, 357, contains only a partial report.]

him the twenty-five cents; that I would like to have him taken the horse back; 'No,' he said, 'I was sick of my bargain;' he did not want the horse; so I kept him. I offered it to him several times. He would not take it back until after he died, I gave it back to Mrs. Wolff." At another time his sister-in-law came with her husband, on Sunday, to his house. Wolff told her he did not want her there, and she must go home. This seemed strange to his wife as he had always before been glad to see her when she came. On the day he died, a female acquaintance and friend of the family came to visit at his house. Wolff sent her home, so much to his wife's chagrin that she went home with her. On her returning she found her husband lying upon the sofa with a discharged pistol in his hand. The testimony showed that several times within this time he threatened to take his own life, declaring to his brother that he would not live longer. He had returned home from his work on the occasion of dismissing the friend of his wife, as above stated, and soon after shot himself. This was, substantially, all the testimony tending to show insanity.

Trowbridge & Dowling, for plaintiff.
C. I. Walker and A. B. Maynard, for defendant.

BROWN, District Judge. In considering whether there was sufficient evidence of insanity to be submitted to the jury, it was insisted at the outset of the argument that the act of suicide in itself was no evidence of mental aberration, and, indeed, it was conceded that, standing alone, it would not be sufficient proof to justify a verdict for the plaintiff. I find no case which goes further than this. In Terry v. Insurance Co. [Case No. 13,839], and Coverston v. Connecticut Mut. Life Ins. Co. [Id. 3,290], it is stated, "There is no presumption of law, prima facie or otherwise, that self-destruction arises from insanity." In Moore v. Connecticut Mut. Life Ins. Co. [Id. 9,755], Judge Longyear says, "The fact of suicide is not, in itself, evidence of insanity." In McClure v. Mutual Life Ins. Co. [55 N. Y. 651], it is said by the New York court of appeals, "Insanity cannot be presumed from the mere commission of this act." The question was fully and ably discussed and considered in Coffey v. Home Life Ins. Co., 35 N. Y. Super. Ct. 314. The court upon the trial at nisi prius charged that, "The law cannot and does not presume that a party, in the full possession of his mental faculties in that normal condition of mind that we call sanity, will deliberately take his own life, and, therefore, as there is no presumption, it favors insanity at the time of the committing of the act of self-destruction. I therefore charge you as a matter of law, that as affecting this case, you must presume that the deceased, when he took his life, was not in a sound state of mind." This was held to be error, and Chief Justice Barbour, in delivering the opinion, says: "The most that can be said is that, inasmuch as many and perhaps most persons who destroy their own lives, are insane at the time, the fact of such self-destruction itself wholly removes the presumption of sanity." Sedgwick, J. in concurring, also announces that "a judge cannot determine whether an individual case of suicide is the result of insanity; that he cannot make a presumption upon the subject which is a generalization, more or less perfect, from individual cases." The same judge remarked in a subsequent case, in the same volume (Weed v. Mutual Ben. Life Ins. Co., Id. 387): "The mere fact that a man kills himself does not create a presumption that he was insane. The general presumption is that every man is sane until the contrary facts are proved by the facts of the case. Suicide is but one fact which goes to the jury with all the other pertinent facts, for the purpose of getting from them a verdict as to whether the facts prove insanity."

This is the limit of authority upon the subject. It follows, then, that neither an act of suicide, nor an attempt, nor a threat to commit suicide, standing alone, creates a presumption of insanity that would be sufficient to justify a jury in finding the party insane. None of the cases, however, go so far as to say that such an act cannot be considered in connection with the previous demeanor and conduct of the party, as evidence of insanity. Indeed, to say that suicide under no circumstances is evidence of insanity is to contradict the experience of every person who has dealt with the insane. One of the most frequent forms of mental disease is known as the suicidal mania. Dean, Med. Jur. 508. The author remarks in connection with this form of derangement: "Another feature it possesses in common with other forms of mental hallucination, is the occasional exacerbations that are continuous; when its symptoms for a time disappear the clouds of melancholy seeming to vanish, and all appearances indicating a return to health and its enjoyments. Again the propensity will reappear and generally, in the end, accomplish its purpose." I think no court could be found to hold that the repeated and causeless attempts to take one's life would not be proper to go to the jury as evidence of insanity. If repeated attempts are evidence, it is difficult to say why a single attempt or an act of suicide may not also be permitted to go to the jury, as there must be a first time. From motives of public policy rather than upon strict philosophical principles, the law has pronounced, and I have no doubt properly, a single act insufficient evidence of mental disease; but in connection with other circumstances it has always been deemed worthy of consideration. In the leading case of Borradaile v. Hunter, 5 Man. & G. 639, Erskine, Judge, told the jury that they must

take the act itself into consideration in connection with his previous conduct, and then say whether, at the time of its commission, they thought him capable of knowing right from wrong. So in Brooks v. Barrett, 7 Pick. 94; and in Burrows v. Burrows, 1 Hagg. Ecc. 109, it is said the law does not consider the act of suicide as conclusive evidence of insanity; but in both these cases it was laid before the jury in connection with other circumstances. See, also, 1 Redf. Wills, 116; Duffield v. Robeson, 2 Har. [Del.] 375; Chambers v. Queen's Proctor, 2 Curt. Ecc. 415. In all these cases it is inferentially, if not directly, decided that suicide is a legitimate item of testimony.

The rule of the criminal law is the same. From motives of public policy the law will not permit a person charged with larceny to say that the act itself proves him insane, while repeated and causeless acts of the same kind would be the strongest and only possible evidence of a species of mental disorder known as kleptomania. Dean, Med. Jur. 502. Instances are by no means rare of ladies whose birth and education would render them abhorrent of a criminal act, and whose circumstances would naturally remove them from temptation, being detected in frequent attempts to steal articles of trifling value, apparently from no motive except gratification of an abnormal passion. Such facts are undoubtedly proper to be laid before a jury, as evidence of kleptomania. A like rule would quite frequently obtain in cases of arson, homicide, and possibly other crimes. In determining, then, whether the evidence of insanity in this case was sufficient to justify a verdict for the plaintiff, I think the fact of the suicide and the threats, made upon the day of the death of the deceased, were proper to be considered by the jury in connection with his previous conduct.

It is insisted, however, that the insane acts, relied upon, were simply eccentricities of demeanor or, at most, temporary hallucinations, which lasted but a few minutes at a time, and ceased entirely some months before his death, leaving him perfectly sane and able to take care of his business. It is quite true there is no presumption of continuous insanity, temporary in its character, but I apprehend in most, if not all the cases, that support that doctrine, that the delusions were connected with some bodily disease, such as fever, pleurisy or delirium tremens, and necessarily ceased with returning health, or that they occurred so long previous to the commission of the act in question there could be no possible presumption of their repetition. People v. Francis, 38 Cal. 183; Staples v. Wellington, 58 Me. 459, 460; Hall v. Unger [Case No. 5,949]; Knickerbocker Life Ins. Co. v. Peters, 42 Md. 414; Carpenter v. Carpenter, 8 Bush. 283; Greenl. Ev. 689.

It does not appear in this case that Wolff was affected with any disorder likely to be accompanied by insane manifestations. The delusions to which he was subject extended over a period of several months, and recurred without regularity, and apparently without cause. While nothing unusual was observed in his demeanor, for some months before the day of his death, his manner upon that day was such as to attract his brother's attention, and his conduct towards a visitor at his house such as to excite his wife's anger and induce her to leave his house. In this class of cases courts are very loth to take the question of insanity from the jury, and in the recent case of Charter Oak Life Ins. Co. v. Redel [95 U. S. 232], the supreme court of the United States said, if there was evidence of insanity the judge could not properly take the case from the jury. While I think there is nothing in this case indicating that the court intended to vary the rule announced in Pleasants v. Fant, 22 Wall. [89 U. S.] 116, and that the court would still be justified in disregarding a scintilla of evidence and instructing a verdict for the defendant, I think very great caution should be exercised in withdrawing from their consideration questions of insanity upon which the opinions of men, equally wise, are likely to differ. While it is quite possible there may be a strong bias in this class of cases against insurance companies, this is an argument which should be addressed to the legislature rather than the courts. I think there was no error in submitting the question of insanity to the jury in this case.

This case should be read in connection with Moore v. Connecticut Mut. Life Ins. Co. [Case No. 9,755].